UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF DATA ASSOCIATED WITH FACEBOOK ACCOUNT WWW.FACEBOOK.COM/KIZZY.BEAR.7 | Mag. No. 18-mj-149-DL<br><br> Under Seal |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Brian Keefe, being first duly sworn, state under oath as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Special Agent of the Federal Bureau of Investigation (hereafter, "FBI") and have served in that capacity since 1999. While employed by the FBI, I have investigated cases involving federal crimes of violence to include bank robbery, Hobbs Act Violations and carjacking. During such time, I have participated in numerous arrest and have been the affiant on numerous arrest warrants and search warrants. I am currently assigned to the Bedford, New Hampshire Resident Agency of the FBI.

2.  This affidavit is being submitted in support of an application for a warrant, under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure, to search and seize the Facebook account affiliated with the Facebook account www.facebook.com/kizzy.bear.7, associated with Kayla Schade-Nameth ("Kayla Schade-Nameth Facebook account") and other data associated with this account, as described in Attachment A. There is probable cause to believe that the Kayla Schade-Nameth Facebook account contains fruits, evidence, and instrumentalities of the crimes listed above, as described in Attachment B.

3.      The Kayla Schade-Nameth Facebook account and relevant data is maintained by Facebook, Inc., which, government databases indicate, accepts service of process at 1601 Willow Road, Menlo Park, CA 94025 and via its law enforcement portal at www.facebook.com/records.

4.      As set forth below, the factual basis for the issuance of this search warrant is based upon information obtained from my own personal knowledge, observations, and beliefs, information provided by other law enforcement officers and officials, my training and experience, and the training and experience of other law enforcement officials assigned or assisting with this investigation.

5.      The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant. Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation. That being said, I am not aware of any information that would contradict the information provided here, or to suggest that probable cause does not exist.

## FACEBOOK

6.      Facebook is an online social networking service accessible at the website www.facebook.com or via an application ("app") that can be installed on computer equipment, including a tablet or a cell phone. Facebook allows users to create profiles and share personal and biographical information; share content and media, including by uploading photographs and videos and sending links to other content; and communicate with other users in a variety of ways, from public discussions to private messaging.

7.      When a user creates a Facebook account, they provide Facebook with information to begin building their online Facebook profile, including uploading at least one photo and

selecting a Vanity Name and email address that will be associated with the account. The user may choose to provide other information as well for the "About Me" section of the page, including basic information such as where the user lives, works, and attends/attended school. This information is then displayed on the user's page. The user may also provide Facebook with other contact information, such as phone numbers and email addresses. In addition, Facebook captures certain basic information about the new account, including the registration date and the IP address used to create the account. Further, Facebook assigns a unique numerical identifier to the account.

8. Facebook users can continually build their online profile, and in my training and experience, it is common for users to add and edit biographical information – for instance by updating on a new job or changing a "relationship status" to reflect changes in their life. Facebook actively prompts users to provide or confirm information, for instance by asking the user to confirm that they live in a particular city if other information in the profile or the majority of connections suggests that they might live in that city. As a result, Facebook users typically provide a significant amount of biographical information.

9. Facebook also encourages users to form connections with other users on the site, most fundamentally by allowing users to connect as "Friends." A Facebook user creates a "Friend" connection by inviting another Facebook user to confirm that they are "Friends." When the request is accepted, the connection is created. Facebook also prompts users to connect with other users when they share common connections.

10. Facebook offers users a variety of privacy settings. The Vanity Name and the Profile Picture and Cover Photo are publicly visible to anyone that visits the page, and are generally searchable unless a user has selected not to be searchable. Facebook users can keep

their entire profile open publicly as well, which allows anyone to view all of the content and information on their profile. The Facebook can make the content of their page visible only to users that have been confirmed as "Friends," or visible to both "Friends" and anyone confirmed as a "Friend" of their "Friend" (exponentially increasing the number of people that can view that content). Further, Facebook users can create lists within their "Friends" and allow certain content to be viewed only by subgroups of their Friends (e.g. "Friends" designated as "Work Friends" or "Family").

11. The first page of every Facebook account displays a Vanity Name and the space for both a "Profile Picture" and a "Cover Photo." Facebook users can post additional photos or even entire photo albums. In my training and experience, most Facebook users build their profiles by uploading and changing photographs on their account. Many users own mobile devices that contain cameras, and it is common for mobile cameras and popular camera mobile applications (such as Instagram, an application owned by Facebook) to prompt users to post pictures to their Facebook accounts after a photo is taken.

12. Facebook users have the ability to indicate that other people who appear in their photos are also on Facebook by "tagging" them in the photograph using their Vanity Name. A Facebook user can adjust their privacy settings to require that they confirm a tag before it can be successfully applied.

13. Facebook users can comment on their own photographs and other users' photographs or indicate that they "Like" a particular image.

14. In addition to photographs, Facebook users can write messages, or "Status Updates," on their page. This was traditionally referred to as their "wall" or a "wall post," and is now called a "Timeline." Unless the user actively deletes them, older postings may be viewable

on the users' account by looking back through the "Timeline." Facebook users can also add "life events" with a date on their "Timeline," such as the date they began a particular job or were married. As with photographs and other content, the user can select who can view their posts – allowing them to be visible publicly (the default) or limiting their display to only a selected group of individuals.

15. Facebook users can also send private messages to other Facebook users, as well as to email addresses. These messages are only viewable by the recipient.

16. Facebook users can also create or join "Groups" of other users. Facebook Groups are used by a variety of communities and small groups and are a tool to communicate and share content.

17. Facebook also allows public figures, businesses, organizations, and other entities to create Facebook Pages. Facebook users can become "Fans" of a Facebook Page.

18. Facebook users provide information about their physical location in different ways through their use of Facebook. As described above, Facebook users may affirmatively state their current address and their hometown. Facebook users may also post Status Updates that discuss where they are, who they are with, and what they are doing. Facebook users who are using a mobile device running the Facebook application may also be able to "Check In" to a location using a feature called "Facebook Places" if the location or establishment from which they are posting offers this feature. The check-in feature allows Facebook users to connect with other users, or "Friends," that are at or near the same location. In addition, Facebook collects other locational information regarding its users, such as the IP address for the device each time the user logs into the site.

19. While it is free to create a profile and use Facebook, Facebook does collect

payment information for some uses. Companies that use Facebook can purchase advertisements and sponsored posts. Individual users can use Facebook Marketplace, an online classified service, to sell or purchase items. Facebook users can also purchase games and software applications, and related real or virtual products. Facebook users can also purchase "Facebook Credits" that can then be used for games and application purchases.

20. Facebook encourages connectivity and sharing, and numerous websites now allow users to access services or login to their pages through their Facebook account. In addition, many websites allow users to use Facebook to indicate that the user "Likes" the website, product, or affiliated group. Based on my training, I understand that Facebook also often obtains information regarding other internet activity by its users, even when that user has not actively logged in or affirmatively selected the "Like" button.

21. Facebook was founded in 2004 and has continually evolved, adding different types of services. In 2012, Facebook announced that it had grown to have more than 1 billion active users.

## PROBABLE CAUSE

On the basis of the following information, I believe that there is probable cause to believe that Joseph Crocco ("Crocco") committed a bank robbery on December 21, 2017, by taking through force, violence, and intimidation approximately $2,709.00 in United States currency from the Service Credit Union located within the Walmart Super Center, 724 Brattleboro Road, Hinsdale, New Hampshire, a bank whose accounts are insured by the National Credit Union Administration, in violation of Title 18, United States Code, Section 2113(a) and that evidence of this violation may be found on the Kayla Schade-Nameth Facebook account.

22.     On December 21, 2017, at approximately 5:50 p.m., members of the HPD responded to the Service Credit Union located within the Walmart Super Center, 724 Brattleboro Road, Hinsdale, New Hampshire, for the report of a robbery. Employees at the Service Credit Union informed members of law enforcement that the robbery was committed by one male. Two employees were working behind their respective teller stations at the time of the robbery and were interviewed by law enforcement.

23.     Employee Rebecca Matthews observed a male standing near an entrance at Walmart and then moving behind a display in Walmart watching her and teller Tara Worcester for two or three minutes. The male walked up to Worcester and handed her two notes. Matthews observed Worcester take money from her teller drawer and then give it to the male in a plastic bag provided by the male. The male took the money and the notes and ran out of the store. Matthews described the male as a white male with facial hair wearing sunglasses, a hooded sweatshirt, a winter cap, a black jacket and a black scarf.

24.     Employee Tara Worcester observed a male watching her and employee Rebecca Matthews from inside of the Walmart store near the entrance for approximately three to five minutes. The male walked directly to Worcester at her teller counter and handed her two written notes. One note instructed her to "fill" the bag and the other note stated the male had a bomb. The male also verbally indicated to Worcester that she had sixty seconds to comply or he was going to detonate the bomb. Worcester gave the male cash in a plastic Rite Aid bag that he provided. The male took the bag and fled the building. Worcester described the male as a white male with facial hair wearing sunglasses, a dark baseball cap and a black jacket.

25.     A review of Service Credit Union video surveillance footage revealed the male was wearing a black coat over a sweatshirt which had a grey hood with white stripes. The hood

of the sweatshirt was up and over a silver or gray knit hat. The knit hat was placed over a baseball cap. The male was wearing black-rimmed glasses with wide gold temples. Approximately $2,709.00 was taken during the robbery.

26. A review of Walmart video surveillance footage revealed the male running towards the north side of the Walmart parking lot and into the woods behind a large picket fence. The male then runs behind the fence in a westerly direction.

27. A perimeter was established by law enforcement and a NHSP K9 unit was deployed to attempt a track. The K9 team began the search at the location where the male fled behind the fence on the north side of the property and continued to track in a westerly direction. Along the track, approximately fifty to seventy-five feet from the point where the male entered the woods, a silver knit hat with a "pom-pom" was located on the ground. The hat was fresh and appeared to be recently dropped on the ground. The hat is similar in appearance to the knit hat worn by the bank robber.

28. The K9 team continued to track to a silver 2007 Volvo V50 bearing North Carolina registration EMV1413 in the field behind the Walmart store. The vehicle was found to have a warm engine compartment with the front passenger window down. The vehicle was stuck in the snow and it appeared that attempts were made to free the vehicle by trying to gain traction in the snow. Items of debris and fresh snow were observed near the front wheel drive tires of the vehicle.

29. A registration check on the vehicle determined that it was registered to Kayla Marie Schade-Nameth of Fayetteville, North Carolina. A social media review of Schade-Nameth's Facebook profile found that she is divorced from Joseph Crocco of Poughkeepsie, New York. Images of Crocco on Facebook are very similar to images of the bank robber, to

include the style of eyeglasses worn by the bank robber and the pattern of facial hair on the bank robber.

30. On December 22, 2017 a female called the towing company where the vehicle was impounded to inquire about retrieving the Volvo. The female eventually identified herself as Kayla Schade of ▇ Branson Street, Fayetteville, North Carolina. This address matches the North Carolina vehicle registration address for the vehicle.

31. On December 22, 2017 PPD advised that they have had contact with Crocco and Schade-Nameth is a known associate of Crocco.

32. On December 26, 2017 HPD obtained a search warrant for the silver 2007 Volvo V50 bearing North Carolina registration EMV1413. A Comerica Bank credit card in the name of "Joseph M. Crocco" with an expiration date of 04/30/2021 was found in the glove compartment. A vehicle insurance card for Schade-Nameth was also found in the glove compartment.

33. On December 22, 2017, HPD obtained an arrest warrant for Crocco for the Service Credit Union robbery. On December 27, 2017, Crocco telephonically contacted the HPD. Crocco stated he was aware of the arrest warrant for him for the bank robbery in Hinsdale, New Hampshire because news of his arrest warrant was on the internet. Crocco stated he did not commit the bank robbery and he has never been to Hinsdale, New Hampshire. Crocco was advised to turn himself into law enforcement. The telephone call was recorded by the HPD.

34. On December 29, 2017, Peggy Sue Crocco (Peggy), the mother of Crocco, was interviewed by law enforcement. Peggy had traveled to Hinsdale, New Hampshire because Schade-Nameth had called her to ask her to go to Hinsdale to retrieve the silver 2007 Volvo V50 bearing North Carolina registration EMV1413 from an impound lot. Peggy stated she did not know why Schade-Nameth had asked her to do this but she believed that Schade-Nameth and her

son were likely in trouble. Peggy was shown photographs from the Service Credit Union bank robbery and indicated that she was certain that the bank robber in the photographs was her son, Crocco. She also stated that on December 22, 2017, Crocco had come to her house and given his children several hundred dollars for Christmas. **NOTE: Initial reports from the Hinsdale, New Hampshire Police Department erroneously identified Margaret Rogers as the mother of Crocco and the person who retrieved the Volvo and identified Crocco in the photograph. Investigation has now determined Peggy Sue Crocco (Peggy) is the mother of Crocco and Peggy was the person interviewed by law enforcement on December 29, 2017.**

35. On February 5, 2018, Crocco was located and arrested in Poughkeepsie, New York. After the arrest Schade-Nameth was interviewed by law enforcement. Schade-Nameth stated on the day of the Service Credit Union bank robbery she received a telephone call from Crocco. During the call, Crocco told Schade-Nameth that her vehicle had gotten stuck in the snow in New Hampshire and he needed transportation to leave the area as soon as possible.

36. I seek a search warrant for the information in this account for various reasons. Soon after the bank robbery, law enforcement discovered that Schade-Nameth had deleted or restricted her Facebook account. There may be images of Crocco on her Facebook account which may contain items worn by the bank robber. I believe that Facebook messages between Crocco and Shade-Nameth may contain communications related to the bank robbery. I am requesting data from December 1, 2017 until December 31, 2017, as a period likely to provide evidence of Crocco's appearance and items of clothing near the time of the bank robbery.

37. A prior search warrant issued by the United States District Court, District of New Hampshire was served on Facebook for account information for Schade-Nameth. The warrant was served on Facebook on 07/30/2018. Facebook was unable to locate the account based on

identifiers (such as name, location, and date of birth) provided by law enforcement at the time. On 08/17/2018, I obtained new information identifying the specific Facebook account used by Schade-Nameth as www.facebook.com/kizzy.bear.7. Based on this new information, it is believed that Facebook will be able to locate the account.

38. From my training and experience, I am aware that companies that host social-networking accounts, and Facebook in particular, generally maintain records of their subscribers' online activities and private communications unless the user deletes these communications. It is unknown if Schade-Nameth has deleted any of these communications.

39. The government may obtain both electronic communications and subscriber information by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

40. Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the Internet company whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

41. If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

42. Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Facebook, as with a conventional warrant, but rather by serving a copy of the warrant on the companies and awaiting their production of the requested data. This practice is approved in 18

U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

43.     Based on the training and experience of myself and other law enforcement, I understand that e-mail and social media providers sometimes produce data in response to a search warrant outside the 14-day (formerly 10-day) period set forth in Rule 41 for execution of a warrant.  I also understand that electronic communication companies sometimes produce data that was created or received after this 14-day deadline ("late-created data").  The United States does not ask for this extra data or participate in its production.

44.     Should Facebook produce late-created data in response to this warrant, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s) absent a follow-up warrant.  However, I request permission to view all late-created data that was created by Facebook, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.

45.     For these reasons, I request that the Court approve the procedures in the respective Attachments B, which set forth these limitations.

## CONCLUSION

46. Based on the information described above, there is probable cause to believe that the Facebook account www.facebook.com/kizzy.bear.7, associated with Kayla Schade-Nameth (as described in Attachment A), contains fruits, evidence, and instrumentalities of these crimes (as described in Attachment B).

47. The procedures for copying and reviewing the relevant records are set out in Attachment B.

_____
BRIAN KEEFE, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this \_\_ day of August, 2018, at Concord, New Hampshire.

_____
DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

**ATTACHMENT A**

The premises to be searched and seized are (1) the Facebook account associated with the Facebook username www.facebook.com/kizzy.bear.7  (2) other user-generated data stored with this account, and (3) associated subscriber, transactional, and user connection information associated with the account, as described further in Attachment B.  This information is maintained by Facebook, Inc., which accepts service of process at 1601 Willow Road, Menlo Park, CA 94025 and via its law enforcement portal at www.facebook.com/records.

**ATTACHMENT B**

**I.      Search Procedure**

A.      Within fourteen days of the search warrant's issue, the warrant will be served on Facebook personnel, who will identify the accounts and files to be searched, as described in Section II below.

B.      The company will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

C.      The company will provide the account duplicate to law enforcement personnel.

D.      Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

E.      Law enforcement personnel may review the account duplicate, even if the company produced it after fourteen days from the warrant's issue, subject to the following limitations. If the company provided data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view all late-created data that was created by the company, including subscriber, IP address, logging, and other transactional data, without a further order of the Court. Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

**II.     Accounts and Files to Be Copied by Company Personnel**

A.      All data files associated with the account associated with Facebook username www.facebook.com/kizzy.bear.7 from December 1, 2017 to December 31, 2017, in the following categories:

2

1.      Biographical profile information entered by the user, including data characterized by Facebook, in the following categories:

- "About Me";
- "Date of Birth";
- "Education";
- "Favorite Quotes";
- "Gender";
- "Hometown";
- "Physical Tokens" ("Badges" added by the user to the account);
- "Work".

2.      Communications and messages published, sent or received by the user, including data characterized by Facebook in the following categories:

- "Chat";
- "Messages";
- "Notes;"
- "Photos";
- "Your Posts";
- "Posts By Others";
- "Shares";
- "Status Updates";
- "Videos"

3.      Information about the user's associates, including data characterized by Facebook in the following categories:

- "Connections";
- "Deleted Friends";
- "Family";
- "Followers";
- "Following";
- "Friend Requests";
- "Friends";
- "Groups";
- "Hidden from News Feed" (Friends, apps, or pages hidden from news feed);
- "Likes on Other's Posts";
- "Likes on Your Posts from others";
- "Networks";
- "Pending Friend Requests";
- "Photos";
- "Pokes";
- "Removed Friends";

4. Information regarding the user's location and movements, including data characterized by Facebook in the following categories:

- "Check-ins";
- "Current City";
- "Events";
- "Last Location";
- "Locale";
- "Photos Metadata" (EXIF);

B. All subscriber and transactional records for this account and any associated accounts, including Instagram accounts linked to this account:

1. Names, including;
- "Name"
- "Alternate Name"
- "Name Changes"
- "Screen Names"
- "Vanity URL"

2. Addresses, including;

- "Address"
- "Emails" (addresses, including removed addresses)
- "IP Addresses"

3. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including;

- "Active Sessions"
- "Logins"
- "Logouts"

4. Length of service and types of service utilized, including;

- "Account Status History"
- "Registration Date"
- "Notification Settings";
- "Privacy Settings";
- List of Types of Facebook services utilized (e.g. , "Messages," "Notes")

5. Telephone or instrument numbers, including;

- "Phone Numbers"

6.     Other subscriber numbers or identities, including;

- "Pages You Admin"
- "Linked Accounts"

7.     Means and source of payment, including;

- "Credit Cards"
- "Currency"

**III.   Records and Data to be Searched and Seized by Law Enforcement Personnel**

       A.     Evidence, fruits, and instrumentalities of 18 U.S.C. § 2113(a) (bank robbery), from December 1, 2017 to December 31, 2017 including records or data relating to:

1. Communications or other information relating to bank robbery;
2. The identity and location of any conspirators and associates involved in the criminal activity;
3. Computer activity in furtherance of bank robbery
4. Other Facebook pages or accounts associated with this account;

       B.     All of the subscriber, transactional, and logging records described in Section II (B).